IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

UNITED STATES OF AMERICA    )
    )
v    )    CR. NO. 3:06cr208-MEF
    )
JASON EDWARD COFIELD    )

## RECOMMENDATION OF THE MAGISTRATE JUDGE

The defendant, Jason Edward Cofield ("Cofield"), who has prior felony convictions for possession of controlled substances and trafficking in methamphetamine, is charged in a three-count indictment with being a convicted felon in possession of firearms in violation of 18 U.S.C. § 922(g)(1) and receiving, possessing and concealing stolen vehicles in violation of 18 U.S.C. § 2313.[1] His residence and a shed behind his residence were searched pursuant to a warrant issued by a state court judge. During the search of the shed, officers found firearms and a stolen All-Terrain Vehicle ("ATV"). In the woods behind the shed, the officers found a stolen pick-up truck.

On September 29, 2006, the defendant filed a motion to suppress (doc. # 22), in which he asserts that the search warrant was unconstitutionally deficient because the affidavit filed in support of the warrant did not establish probable cause. Cofield argues that although the search warrant authorized the search of Kenny Cofield's residence, the search warrant did

---

[1] In count one of the indictment, Cofield is charged with being a convicted felon in possession of 3 firearms in violation of 18 U.S.C. § 922(g)(1). In count two of the indictment, Cofield is charged with receiving, possessing, and concealing a stolen motor vehicle, specifically a 2003 Dodge Ram 1500 4x4 Truck, in violation of 18 U.S.C. § 2313. In count three of the indictment, Cofield is charged with receiving, possessing, and concealing a stolen motor vehicle, specifically a Honda All-Terrain Vehicle, in violation of 18 U.S.C. § 2313. The indictment also contains a forfeiture allegation.

not authorize the search of his residence.[2]    Predictably, United States contends that the search warrant was valid. In addition, the United States argues that, regardless of the validity of the warrant, *United States v. Leon*'s[3] good faith exception applies to save the search's fruits because the officers relied on the state court judge's determination that the warrant established probable cause to search Jason Cofield's residence. The court held an evidentiary hearing on the motion to suppress on October 27, 2006, and a supplemental evidentiary hearing on December 11, 2006.    Based on the evidence presented to the court and the argument of the parties, the court concludes that the motion to suppress is due to be granted in part and denied in part.

## FACTS

On January 24, 2006, Lee County sergeant Donnie Surrett ("Surrett") obtained from a state Circuit Court judge a warrant to search

> The residence of Willis "Kenny" Cofield, alias, Brian Cofield, alias, Jason Cofield, alias, and Michael Cofield, alias, which is located at 5766 Lee Road 270, Valley, Lee County, Alabama, and any and all vehicles and/or buildings (above ground and below ground) to include two manufactured homes, which is located within the curtilage of said property.

(Def's Ex. 1).

The address of the Cofield property is 5766 Lee Road 270, Valley, Alabama. The property consists of 119 acres of contiguous land. (Evid. Hr'g Tr. at 37). The entrance to

---

[2] In his motion to suppress, the defendant asserts that more than one search warrant was issued for the property. It is undisputed that the defendant is challenging the warrant and search executed on January 24, 2006.

[3] *United States v. Leon*, 468 U.S. 897 (1984)

2

the Cofield property is protected by a locked gate.  On this property, Kenny Cofield has a home and a shop in which he makes stained glass windows.  (*Id*. at 9).  Kenny Cofield's residence and shop is surrounded by fences and is accessed by a driveway appropriately one eighth of a mile long.

Several of Kenny Cofield's sons also live on the property.   Traveling from the gate up the driveway, Jason's[4] residence is on the right of the driveway approximately 800 feet from Kenny's house and outside the fencing that separates Kenny's residence from the remainder of the property.  Jason lives in a mobile home; his address is 5796 Lee Road 270. (*Id*. at 7).  Brian lives in a trailer located at 5842 Lee Road 270.  Brian owns an additional 31 acres of land.[5]  (*Id*.)  Kevin lives in a trailer at 5842 Lee Road 270.  Michael does not reside on the property.  He lives in Opelika, Alabama on Highway 148.  (*Id*. at 7-8).  On Lee Road, each Cofield has his own mailbox with his name and number on the mail box.

In the affidavit in support of the search warrant, Surrett asserts that

> [d]uring the past six months, the Lee County Sheriff's Office has received information that Jason Cofield, alias, Brian Cofield, alias, and Willis "Kenny" Cofield, alias, were involved in the clandestine manufacture of methamphetamine, as well as the unlawful distribution of methamphetamine. It was determined that the Cofields' address is 5766 Lee Road 270, Valley, Lee County, Alabama.

(*Id*.)

---

[4]  At this point, for the sake of simplicity and fluidity, the court will distinguish between the Cofields by using their first names without repeating their last name.

[5]  According to Kenny Cofield, these 31 acres used to belong to his mother but Brian Cofield now owns the land.  (Evid. Hr'g Tr. at 9).

The last sentence of the above quoted paragraph is the only reference in the affidavit which indicates that the requested authority related to the property of more than one person. At least four times in the application and affidavit in support of the application Surrett refers to a single defendant as "Willis 'Kenny' Cofield, alias, Brian Cofield, alias Jason Cofield, alias Michael Cofield, alias." During the evidentiary hearing, Surrett testified that he understood the term "alias" meant "nickname," and he uses the term alias "when there's multiple, I guess suspects or Defendants, . . . after the name." (Supp. Evid. Hr'g Tr. at 46-47). According to Surrett, use of the term "alias" would "cover us if we misspelled the name. Like it was Michael and there's a typing error, if we put alias after it it would still hold up in court because of any errors, it would cover any errors in it." (*Id*. at 47). Surrett testified that when he got the search warrant from Judge Walker, he knew that Jason, Brian and Michael were Kenny Cofield's sons, (Evid. Hr'g Tr. at 98), but that he did not convey that information to Judge Walker. (Supp. Evid. Hr'g Tr. at 49-50).

After securing the search warrant, Surrett briefed other law enforcement officers on the search, instructing them that "there were multiple residences on the property that [they] would be simultaneously" searching. (Supp. Evid. Hr'g Tr. at 8). Investigator Keith Jordan was assigned to search Jason's residence.[6] (*Id*.) Jordan testified that he did not look at or read the search warrant. Rather, it was his "understanding of the warrant . . . that it covered both the residence of . . .Kenny Cofield, Jason Cofield, and potentially Brian Cofield, all

---

[6] Jordan testified that Surrett told him that there were multiple residences on the property, and that he was assigned to search Jason's residence. (*Id*. at 9).

4

located on the Cofield property. And their respective sheds or storage buildings with those residences." (*Id*.). According to Jordan, there were three search teams: the Kenny Cofield team, the Jason Cofield team, and the Brian Cofield team. (Supp. Evid. Hr'g Tr. at 10).

Once the officers arrived at the Cofield property, Jordan went to search Jason's residence while other officers searched Kenny's residence. (*Id*. at 9). A SWAT team made entry and cleared the residence before Jordan's search team entered Jason's home. (*Id*. at 9). After ascertaining that the residence was safe, Jordan testified that he walked away from the residence to a wooded area to inspect the shed.[7] (*Id*. at 12). As Jordan approached the shed, he smelled "a strong odor of ammonia." (*Id*. at 13). He also noted that the shed had mounted motion sensors and closed circuit surveillance cameras, and it appeared that there was power running to the shed. (*Id*. at 14-15). Finally, behind the shed, Jordan discovered a compressed gas cylinder tank with corrosion on the value. (*Id*. at 15-16). According to Jordan,

> [o]nce we began smelling the ammonia, found the tank, saw the camera systems and knew we had power going to the trailer, and that it was – the standard door was locked from the inside, we weren't sure what the safest method would be to breach the door and make entry. I consulted with Mr. Maddox and he stated that he had a high pressure water cannon system that they use. They are able to breach windows without detonating anything that might be attached and then we could use a mirror system to look around the inside and see if anything appeared booby trapped to the doors.

(*Id*. at 17).

Using the water cannon, the officers were able to breach the window. (*Id*. at 24). After determining that the shed was not booby-trapped, the officers entered the shed and

---

[7] Jordan testified that the shed was "around 30 yards, maybe 35 yards" away from the residence. (*Id*. at 12).

seized three firearms, and two stolen four-wheel all terrain vehicles.[8]  (*Id*. at 20-22).

After examining the shed, the officers followed "an obvious, well-worn trail" into the woods, and discovered there a pick-up truck.  Visible in the bed of the truck were compressed gas cylinders and other items used in the making of methamphetamine.  (*Id*. at 23).  Locating the vehicle identification number ("VIN"), the officers were able to determine that the truck was stolen in the state of Georgia.   Jason Cofield was subsequently indicted for being a convicted felon in possession of a firearm and receiving stolen property.

## DISCUSSION

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. CONST. AMEND. IV.[9]  "The Amendment protects persons against unreasonable searches of "their persons [and] houses."  *Minnesota v. Carter*, 525 U.S. 83, 88 (1998).  The Fourth Amendment further provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  Probable cause to support a search warrant exists when "there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *United States  v. Brundidge*,  170 F.3d

---

[8]  Because one of the ATVs was stolen in Alabama, it is not the subject of the indictment in this case.

[9]  Specifically, the Fourth Amendment provides that "[]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

1350, 1352 (11th Cir. 1999).  Evidence seized as the result of an illegal search may not be used by the government in a subsequent criminal prosecution.  *United States v. Martin*, 297 F.3d 1308, 1312 (11th Cir. 2002).

### A.  Search Warrant

Although it is difficult to discern the exact nature of Jason's arguments, the court construes Jason's position to be that the evidence taken from his shed during the search conducted on January 24, 2006, should be suppressed because the warrant secured by Surrett did not authorize the search of his residence or property within the curtilage.   In the alternative, Jason argues that Surrett did not have a warrant to search his property.

It is undisputed that the search warrant at issue authorized the search of Kenny's residence.  The question before the court is whether that warrant also authorized the search of Jason's residence.   The court looks to the four corners of the state court warrant to determine whether the warrant established probable cause for the officers to search Jason's residence.   The issuing judge had before him the application for a search warrant and Surrett's affidavit.  Except for the one mention of the "Cofields" the documents refer to only a single defendant and a single residence, notwithstanding Surrett's use of the word "alias."

Webster's Dictionary defines the term "alias" as

otherwise called: otherwise known as – used esp. in legal proceedings to connect the different names of anyone who has gone by or been known by two or more names; . .. another name; ... an assumed name.

*Webster's New International Dictionary* 53 (3rd ed. 1966 unabridged).

Black's Law Dictionary defines "alias" as "[a]n assumed or additional name that a

person has used or is known by." *Black's Law Dictionary* 79 (8[th] ed. 2004).  Based on these definitions and the common understanding of the meaning of the word "alias," the court must conclude that a reasonable person in the issuing judge's position would not construe the application or affidavit as requesting permission to search the residences of four different people.  The mere fact that the Lee County Sheriff's department uses the term "alias" to describe multiple defendants or to protect against typographic errors does not save this warrant.

During argument about the warrant, the Assistant United States Attorney opined that "there's no question that this warrant will not end up in the warrant hall of fame."  The court agrees.  Surrett testified that he knew that Jason, Brian and Michael were Kenny's sons.  The affidavit recites that Surrett had probable cause to believe that methamphetamine was being manufactured at the residence of Willis 'Kenny' Cofield.  There is nothing in the warrant to connect the warrant to Jason Cofield's residence.  There is nothing within the four corners of the affidavit which shows there existed a fair probability that Jason Cofield's residence would contain evidence of the crime of manufacturing methamphetamine or that Jason Cofield's residence was the object of the warrant.  Accordingly, after careful consideration, the court concludes that the warrant issued for the search of Kenny's residence did not authorize the search of Jason's residence.

The United States contends that Jason's residence falls within the curtilage of Kenny's home.  "What is curtilage is a question of fact."  *United States v. Berrong*, 712 F. 2d 1370, 1374 (11th Cir. 1983).  The Supreme Court has

recognized that the Fourth Amendment protects the curtilage of a house and that the extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself. We identified the central component of this inquiry as whether the area harbors the "intimate activity associated with the 'sanctity of a man's home and the privacies of life.'"

. . .

"[C]urtilage questions should be resolved with particular reference to four factors: the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by."

*United States v. Dunn*, 480 U.S. 300-01 (1987) quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984) (internal citation omitted). In this case, Jason's residence was 800 feet away from Kenny's residence and was separated by fencing which enclosed Kenny's residence. Jason's shed stood even further from Kenny's property, behind Jason's residence. Moreover, it hardly seems necessary to point out that another person's home, even a son's home, is hardly a place which harbors the intimate activities of another man's home and his privacies.

Additionally, it is undisputed that the shed which was searched falls within the curtilage of Jason's residence. *See United States v. Williams,* 581 F.2d 451, 454 (5th Cir. 1978) (shed on property falls within the curtilage of residence).[10] *See also Walker v. United States*, 225 F.2d 447, 449 (5th Cir. 1955) (barn "was a domestic building constituting an integral part of that group of structures making up the farm home.")

For the reasons as stated, the court concludes that the warrant did not establish

---

[10]  *See Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

probable cause for the search of Jason's residence on the shed within the curtilage.

## B. Exigent Circumstances to Search Shed

At the supplemental evidentiary hearing, the United States argued that, in the event the court found that the search warrant did not authorize the officers to search Jason's residence and curtilage, exigent circumstances existed to permit the search of the shed. *See, e.g., Warden v. Hayden*, 387 U.S. 294 (1967); *United States v. Blasco*, 702 F.2d 1315, 1325 (11th Cir. 1983) (A warrantless entry must be justified not only by probable cause but also by exigent circumstances).

Searches and seizures inside a home without a warrant are presumptively unreasonable, *Payton v. New York*, 445 U.S. 573, 586 (1980), unless there exists probable cause and certain, limited exigent circumstances. *See, e.g., Warden*, *supra*; *United States v. Blasco*, 702 F.2d 1315, 1325 (11th Cir. 1983) (A warrantless entry must be justified not only by probable cause but also by exigent circumstances). The exigent circumstances doctrine recognizes several common situations where police need not take time to secure a warrant as in the case, for example, of a hot pursuit. *United States v. Santana*, 427 U.S. 38, 42-43 (1976). "Exigent circumstances" refer to a situation where delay incident to obtaining a warrant must give way to an urgent need for immediate action such as when resort to a warrant might endanger the police or the public. *See e.g., Cady v. Dombrowski*, 413 U.S. 433, 447 (1973). For example, in *United States v. Burgos*, 720 F.2d 1520 (11th Cir. 1983), officers had a reasonable belief that a house was laden with weapons and occupied by a number of people.

10

> The threat of injury to the neighborhood and arresting officers justified the avoidance of delay involved in obtaining a warrant. Quick action increased the likelihood that no one would be injured. "The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others." *Warden v. Hayden*, 387 U.S. 294, 298- 299, 87 S. Ct. 1642, 1645-46, 18 L. Ed. 2d 782 (1967). Only by entering the house and searching for persons and weapons could the agents have control of all weapons which could be used against them or to effect an escape. The societal costs of delay outweighed the social interest in resort to a neutral magistrate in this instance. The exigencies of this situation made the warrantless entry lawful.

*Burgos*, 720 F.2d at 1526.

As the Supreme Court constantly reminds us, the principal Fourth Amendment question is always "reasonableness."

> Nevertheless, because the ultimate touchstone of the Fourth Amendment is "reasonableness," the warrant requirement is subject to certain exceptions. *Flippo v. West Virginia*, 528 U.S. 11, 13, 120 S.Ct. 7, 145 L.Ed.2d 16 (1999) (per curiam); *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). We have held, for example, that law enforcement officers may make a warrantless entry onto private property to fight a fire and investigate its cause, *Michigan v. Tyler*, 436 U.S. 499, 509, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978), to prevent the imminent destruction of evidence, *Ker v. California*, 374 U.S. 23, 40, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963), or to engage in "hot pursuit" of a fleeing suspect, *United States v. Santana*, 427 U.S. 38, 42-43, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976). "[W]arrants are generally required to search a person's home or his person unless 'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona*, 437 U.S. 385, 393-394, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978).

*Brigham City, Utah v. Stuart*,___ U.S.___, ___,126 S.Ct. 1943, 1947 (2006).

In the instant case, Jordan testified that as he approached the shed, he smelled ammonia. He also observed that the shed had motion sensors, closed circuit surveillance

11

cameras, and power running to the shed.  According to Jordan, the officers were concerned

about the possibility of the shed being booby-trapped.

> Once we began smelling the ammonia, found the tank, saw the camera systems
> and knew we had power going to the trailer, and that it was – the standard door
> was locked from the inside, we weren't sure what the safest method would be
> to breach the door and make entry.  I consulted with Mr. Maddox and he stated
> that he had a high pressure water cannon system that they use.  They are able
> to breach windows without detonating anything that might be attached and
> then we could use a mirror system to look around the inside and see if anything
> appeared booby trapped to the doors.

(Supp. Evid. H'rg Tr. at 17).

The officers were able to use the water cannon to breach the window and determine

that the shed was not booby-trapped.  (*Id*. at 24).  Certainly, the potential harm to officers

and others of booby traps is the type of circumstance that permitted the officers to breach the

shed windows with the water cannon.   However, once the officers determined that the shed

was not booby-trapped, the exigency ended and there was no reasonable basis for the officers

to continue their intrusion.  Accordingly, because there were no exigent circumstances when

they entered the shed and searched, the warrantless search was not justified.  In short, all of

the evidence seized as a result of the search of Jason's shed is due to be suppressed unless

*Leon's* good faith exception applies.  The court turns to that question now.

### C.  The "*Leon*" Good Faith Exception to the Warrant Requirement

The government argues that the evidence seized from the shed is admissible under the

good faith exception established in *United States v. Leon*, 468 U.S. 897 (1984).  In *Leon*, the

Supreme Court recognized a good faith exception to the exclusionary rule for searches

conducted pursuant to warrants. Observing that the purpose of the exclusionary rule is to deter unlawful police conduct, the Court found that this purpose would not be served, and the rule should not be applied, when officers engage in "objectively reasonable law enforcement activity." 468 U.S. at 918-19. In particular, the Court held that the suppression of evidence would have no deterrent effect "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope." *Id.* at 920. Under *Leon*, searches conducted pursuant to warrants will rarely require suppression; however, the *Leon* court did identify four situations in which suppression would still be appropriate. *Id.* at 923. These situations are: (1) where "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth;" (2) "where the issuing magistrate wholly abandoned his judicial role in the manner condemned in" *Lo-Ji Sales, Inc. v. New York,* 442 U.S. 319 (1979); (3) where the affidavit supporting the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;" and (4) where, depending upon the circumstances of the particular case, a warrant is "so facially deficient – i.e., in failing to particularize the place to be searched or the things to be seized – that the executing officers cannot reasonably presume it to be valid." *Id.* (internal quotation marks omitted).

The first step for the court, therefore, is to determine if any of the four circumstances exist in this case. The first *Leon* limitation, whether the magistrate judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have

known was false except for his reckless disregard of the truth, is not applicable. Cofield concedes that Surrett did not lie to the magistrate to secure the search warrant.

To some extent, Cofield appears to argue that Surrett made "misrepresentations by omission," by failing to inform the judge that Jason, Brian, Kevin and Michael were Kenny Cofield's sons and that the warrant was intended to search multiple residences. Cofield's argument fails for the simple reason that he concedes that Surrett's statements were not false. Further, Jason Cofield has not shown that these statements were made for the purpose of misleading the issuing Judge. Next, nothing in this case suggests that the judge who issued the warrant abandoned his judicial role. Consequently, the first two grounds are inapplicable here.

The remaining *Leon* limitations are whether the warrant is based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable and whether the warrant is so facially deficient that the executing officers cannot reasonably presume it to be valid. The fundamental problem in this case, which the government cannot overcome, is that Jordan testified that he was the officer tasked with searching Jason's residence, and that he never read the warrant or the affidavit. Consequently, he could not have reasonably and in good faith relied on the warrant or the affidavit.

In *Groh v. Ramirez,* 540 U.S. 551, 556 (2004), the Court commented on the opinion of the court of appeals as follows:

With respect to petitioner, the court read our opinion in *United States v. Leon*,

14

468 U.S. 897, 104 S.Ct. 3405 (1984), as precluding qualified immunity for the leader of a search who fails to "read the warrant and satisfy [himself] that [he] understand[s] its scope and limitations, and that it is not defective in some obvious way." 298 F.3d, at 1027. The court added that "[t]he leaders of the search team must also make sure that a copy of the warrant is available to give to the person whose property is being searched at the commencement of the search, and that such copy has no missing pages or other obvious defects." *Ibid*. (footnote omitted).

Concluding that "[i]t is incumbent on the officer executing a search warrant to ensure the search is lawfully authorized and lawfully conducted," the Supreme Court explicitly agreed with the analysis of the court of appeals about the duty of an officer to read and understand a warrant:

> The Court of Appeals' decision is consistent with this principle. Petitioner mischaracterizes the court's decision when he contends that it imposed a novel proofreading requirement on officers executing warrants. The court held that officers leading a search team must "mak[e] sure that they have a proper warrant that in fact authorizes the search and seizure they are about to conduct." 298 F.3d 1022, 1027 (C.A.9 2002). That is not a duty to proofread; it is, rather, a duty to ensure that the warrant conforms to constitutional requirements.

*Groh,* 540 U.S. at 563 n. 6. Because Jordan did not read the warrant, his reliance on it was not reasonable or in good faith. The court concludes that *Leon* does not protect the search and seizure from suppression in this case.

### D. The Pick-Up Truck

After searching Jason's shed, the officers followed a well-worn path through the woods, discovering a stolen pick-up truck. The defendant's argument that the pick-up truck should be suppressed is without merit. It is undisputed that the truck was hidden in the woods behind Jason's resident and was not part of the curtilage. The law is well-established

that "there is no legitimate expectation of privacy in . . . open fields, even if fenced, unless they are part of the curtilage, or the immediate appurtenances, of a home." *United States v. Long*, 674 F.2d 848, 853 (11th Cir. 1982). *See also Hester v. United States*, 265 U.S. 57, 59 (1924) (Fourth Amendment's protection does not extend to open fields.); *United States v. Hodges*, 243 F.2d 281, 283 (5th Cir. 1957) (Fourth Amendment does not protect against trespass in an open field). This is so because a person does not have a legitimate expectation of privacy in open fields. Consequently, the stolen pick-truck was not seized in violation of the Fourth Amendment.

## CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judgeas follows:

1. That the defendant's motion to suppress be granted with respect to the evidence seized in the search of Jason Cofield's residence and shed.

2. That the defendant's motion to suppress be denied with to the stolen pick-up truck. It is further

ORDERED that the parties shall file any objections to the said Recommendation on or before **March 6, 2007.**[11] Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party objects. Frivolous, conclusive or general objections will not be considered by the District Court.

---

[11]This case is presently set for jury selection on and trial during the trial term that begins on March 12, 2007. Consequently, the court shortens the time for filing objections so that the District Judge will have a reasonable amount of time to consider any objections and to make final disposition of the suppression motion.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a de novo determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982). *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982). *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Done this 23rd day of February, 2007.


_____ /s/Charles S. Coody _____
CHARLES S. COODY
CHIEF UNITED STATES MAGISTRATE JUDGE