IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO. 03:06cr208-MEF |
| | ) | |
| JASON EDWARD COFIELD | ) | |
| | ) | |

**UNITED STATES' AMENDED SUPPLEMENTAL BRIEF
ADDRESSING EXIGENT CIRCUMSTANCE TO SEARCH JASON COFIELD'S SHED**

Comes now the United States of America, by and through Leura G. Canary, United States Attorney for the Middle District of Alabama, and respectfully responds to this Honorable Court's Order to file a supplemental brief addressing exigent circumstances surrounding the January 24, 2006, search of Jason Cofield's utility shed. The government respectfully files this amended supplemental brief as it was inadvertently filed without Exhibit A.

**FACTS**

Pursuant to this Honorable Court's Order of May 1, 2007, the United States focuses this brief upon the exigent circumstances exception to the warrant requirement. The United States concentrates its factual discussion on information gathered by Lee County authorities between January 1, 2006, through January 23, 2006, and the personal observations of Investigator Keith Jordan on January 24, 2006, supporting an exigent search of Jason Cofield's utility shed.

On January 1, 2006, Jason Cofield was stopped for a traffic violation. During a consent search of his vehicle, Lee County Sheriff's deputies discovered "compressed gas cylinders" located inside the vehicle. (*See* Exhibit A). According to Investigator Donnie Surrett, these types of cylinders are often used to store anhydrous ammonia. Anhydrous ammonia is a necessary ingredient used in manufacturing methamphetamine. (*Id.*).

Next, on January 10, 2006, during another routine traffic stop of Jason Cofield, dry ice was found in his vehicle. According to Investigator Surrett, "dry ice is commonly used in the clandestine manufacture of methamphetamine by generating anhydrous ammonia." (*Id.*).

Nine days later, on January 19, 2006, Investigator Surrett learned from a known and reliable informant that Jason Cofield was "involved in the manufacture of methamphetamine" and that a **"white utility shed on [Cofield's] property . . . was wired with some type of an explosive."** (Emphasis added) (*Id.*).

Finally, on January 23, 2006, Investigator Surrett learned from another reliable and confidential informant that he had been "overtaken by a strong order of ammonia coming from the direction of the Cofield property." According to this informant, he could smell ammonia for approximately three and a half hours. According to Investigator Surrett, this smell of ammonia is consistent with the presence of a clandestine methamphetamine lab. Adding to this evidence, the reliable and confidential informant reported hearing gunshots coming from the Cofield property. (*Id.*).

Thus, over the course of his investigation, Investigator Surrett gathered increasingly disturbing information establishing the strong probability of a clandestine methamphetamine lab located on Cofield's property. Highlighting the dangers to the citizens of Lee County was the likelihood of improperly stored anhydrous ammonia, reports of a booby-trapped utility shed, strong noxious odors emanating from the property, and reports of gunfire.

Within twenty-four hours of receiving these final reports, Investigator Surrett gathered a large contingent of law enforcement officers, including Alabama Bureau of Investigation bomb technicians, to investigate the clandestine production of methamphetamine on Cofield's property.

Indeed, once on Cofield's property, Lee County deputies plainly saw evidence corroborating their information, and elevating concerns for their safety and the safety of the community.

Tasked with investigating Jason Cofield's residence, Investigator Keith Jordan detected the strong smell of ammonia near Jason Cofield's white utility shed. Based upon his training and experience, Investigator Jordan knew that anhydrous ammonia is a key ingredient in the production of methamphetamine. (*Supp. Evid. Hr'g. Tr.* at 13). Second, Investigator Keith Jordan noticed that the white utility shed was outfitted with surveillance cameras, motion detectors and a lighting system. (*Id*. at 14). According to Investigator Jordan, surveillance systems have been found in approximately 50% of clandestine methamphetamine labs he has investigated. (*Id*.). Next, Investigator Jordan discovered a compressed gas cylinder near the door to the white utility shed. (*Id*. at 15). According to Investigator Jordan, anhydrous ammonia is highly corrosive and is often improperly stored in compressed gas cylinders. Notably, the gas cylinder he saw had a corrosive valve system - suggesting the presence of volatile anhydrous ammonia. (*Id*.). Finally, Investigator Jordan noticed numerous power cords running to the utility shed. (*Id*. at 17). Based upon the presence of these electrical cords, Investigator Jordan reasonably concluded that whatever electrical devices were located inside the shed were functional. Paramount to Investigator Jordan was the possibility that the power cords were connected to some type of explosive device as reported by the confidential informant.[1]

Aggregating all the specific information he knew about Jason Cofield's reported production of methamphetamine, his personal observations at the scene, and his training and experience -

---

[1] According to Investigator Jordan, in January of 2005, Lee County Sheriff's deputies raided a clandestine methamphetamine lab within 10 miles of the Cofield property. On that raid, deputies recovered 30 sticks of dynamite fashioned into a homemade bomb used to protect a clandestine methamphetamine lab. See *Suppression Hearing Transcript, 12/11/06,* p. 8.

Investigator Jordan ordered other officers away from the utility shed, and directed Alabama Bureau of Investigation bomb technician Al Maddox to breach the shed with a water cannon. (*Id.* at 17). According to Investigator Jordan, he gave this order because the ABI bomb technicians "are able to breach windows without detonating anything that might be attached and then we [can] use a mirror system to look around the inside and see if anything appeared booby trapped to the doors." (*Id.*).

After breaching the shed and clearing it for a suspected methamphetamine lab and booby-traps, authorities found stolen ATV's and firearms.

Pursuant to *Nettles v. Wainwright*, 677 F.2d 404 (11th Cir. 1982), the District Court's review of the findings and recommendations of the Magistrate Judge is *de novo*.

## **DISCUSSION**

### *The search of Jason Cofield's shed was permitted by exigent circumstances.*

Even assuming that the warrant obtained by law enforcement to search the Cofield property authorized a search of only Kenneth Cofield's residence, and not Jason Cofield's, law enforcement officers were still permitted to search Jason Cofield's shed due to exigent circumstances. A warrantless search may be conducted when there is probable cause to believe that exigent circumstances, such as a threat to the safety of others, exist. *See United States v. Holloway*, 290 F.3d 1331, 1334 (11th Cir., 2002); *United States v. Davis*, 313 F.3d 1300, 1302 (11th Cir., 2002). "[E]mergency situations involving endangerment to life fall squarely within the exigent circumstances exception." *Holloway*, at 1337. The Eleventh Circuit further explained in *Holloway*, "Although the Fourth Amendment protects the sanctity of the home, its proscription against warrantless searches must give way to the sanctity of human life." *Id.* The standard for officers to use when determining if a warrantless entry is necessary is one of reasonableness, based on the facts available to the officers at the time. Officers must evaluate "the circumstances then confronting the

officer, including the need for a prompt assessment of sometimes ambiguous information concerning potentially serious consequences." *Id.* at 1339 (quoting 3 Wayne LaFave, <u>Search and Seizure</u> §6.6(a), at 391 (3d ed. 1996)).

"As long as the officers reasonably believe an emergency situation necessitates their warrantless search, whether through information provided by a 911 call or otherwise, such actions must be upheld as constitutional." *Holloway* at 1340. The government must prove that probable cause and the exigent circumstances exist. *Davis* at 1302. If entry into a building is permitted because of exigent circumstances, then all evidence in plain view of the officer may be seized. *Glover v. Eight Unknown D.E.A. Agents/Drug Task Force Agents from Birmingham, Alabama Task Force*, No. 06-13061, 2007 WL 559805 at *4 (11th Cir. Feb. 23, 2007) (citing *United States v. McGough*, 412 F.3d 1232, 1238 (11th Cir. 2005)).

**a. The suspected presence of methamphetamine labs and explosives can constitute exigent circumstances authorizing a warrantless search.**

Methamphetamine labs and the chemicals used in them pose a special danger to the surrounding community due to their known volatility and toxic nature. Knowledge of the existence of a methamphetamine lab can constitute exigent circumstances because of the danger such a lab posed to the surrounding community, permitting a warrantless search. Recently, the Eleventh Circuit Court of Appeals recognized the unique dangers posed by methamphetamine production. In *Glover v. Eight Unknown D.E.A. Agents/Drug Task Force Agents from Birmingham, Alabama Task Force,* No. 06-13061, 2007 WL 559805 (11th Cir. Feb. 23, 2007), the Court of Appeals determined that exigent circumstances existed when agents heard a confidential informant wearing a wire begin to cough while inside a home suspected of being a methamphetamine lab. Based on the coughing, a tip they had received that the owner of the home was producing methamphetamine and ordering

chemicals, and that the agents smelled chemicals around the house, the court found that exigent circumstances existed to enter the home to protect the confidential informant's health and safety. *Glover,* 2007 WL 559805 at *3 (citations omitted).

Other Circuits have also recognized the dangers of methamphetamine production and that exigent circumstances exist to justify a warrantless search when law enforcement officers have probable cause to believe that a building is being used to produce methamphetamine. The circumstances supporting this probable cause may include smelling noxious chemicals, observing security systems, the presence of empty gas cylinders or tanks, the presence of other people or homes in the area, information provided prior to the search, and the officer's knowledge and experience of methamphetamine labs. *See United States v. Spinelli*, 848 F.2d 26, 30 (2d Cir. 1988) (dangers of methamphetamine lab posed exigent circumstances which justified violation of knock and announce rule); *United States v. Atchley*, 474 F.3d 840, 849 (6th Cir. 2007) (presence of chemicals commonly used in production of methamphetamine justified expansive warrantless search of room under exigent circumstances doctrine); *United States v. Williams*, 431 F.3d 1115, 1118 (8th Cir. 2005) (officer's observations of propane cylinders with discolored valves, smell of ether, and presence of other people created probable cause to believe methamphetamine lab was present and endangered others, creating exigent circumstances); *United States v. Walsh*, 299 F.3d 729, 734 (8th Cir. 2002) (smell of ether, presence of residue on carpet, and observation of security cameras and electrical power going to outside shed were evidence of methamphetamine lab which created exigent circumstances, allowing warrantless entry into shed); *United States v. Rhiger*, 315 F.3d 1283, 1290 (10th Cir. 2003) (observations of purchase of chemicals used to make methamphetamine, smell of cooking methamphetamine, and knowledge of explosive nature of labs created exigent circumstances to support warrantless search); *see also United States v Lloyd*, 396 F.3d 948, 954 (8th Cir. 2005);

6

*Kleinholz v. United States*, 339 F.3d 674, 676-677 (8th Cir. 2003); *United States v. Echegoyen*, 799 F.2d 1271, 1278-1279 (9th Cir. 1986); *United States v. Erb*, 596 F.2d 412, 419-420 (10th Cir. 1979).

In addition to the production of methamphetamine, explosive devices and "booby traps" may also permit warrantless searches to protect the safety of others under the exigent circumstances exception. "Exigent Circumstances are frequently found when dangerous explosives are involved." *United States v. Lindsay*, 877 F.2d 777, 781 (9th Cir. 1989). *See also United States v. Cooper*, 9 F.3d 506, 510 (6th Cir. 1993) (warrantless search for booby trap permissible because evidence led officers to believe that a "real threat to public safety was presented by the potential presence of explosive devices on the premises").

**b. Exigent circumstances existed to permit a warrantless search of Jason Cofield's shed because investigators reasonably believed that the shed contained a methamphetamine lab and explosives.**

The search of Jason Cofield's shed was consistent with the exigent circumstances exception. Examining the information that was available to the law enforcement officers at the scene, it is clear that they had sufficient evidence to form a reasonable belief that the shed contained a methamphetamine lab and explosives, posing an immediate danger to others. This belief is supported by the training and experience of Investigator Keith Jordan; the information that the investigation had previously developed regarding Jason Cofield's involvement in methamphetamine production; the observations made by Investigator Jordan at the scene; and the presence of a significant number of people in the immediate area.

Investigator Keith Jordan led the group that searched Jason Cofield's shed. He testified at the suppression hearing regarding his experience with and knowledge of the dangers of methamphetamine production. He testified that it involves a dangerous process of mixing and

burning different chemicals, which creates a high risk of explosion, fire, or chemical contamination. In addition, Investigator Jordan noted that in his experience, individuals involved in the production of methamphetamine commonly rig "booby traps" to protect their methamphetamine supply or laboratory. These traps can include explosives designed to explode upon entry by any person into the laboratory. As just one specific example, Investigator Jordan described a previous investigation in which a methamphetamine lab was located in a shed wired with 30 sticks of dynamite. That incident occurred in the same part of Lee County as Jason Cofield's shed. (*Supp. Evid. Hr'g. Tr.* at 6-8).

Prior to the search, the investigation had already uncovered evidence that Jason Cofield's property was involved in methamphetamine production. The search warrant affidavit shows that a witness had reported that Jason Cofield was manufacturing methamphetamine and had a white shed on the Cofield property that was "wired with some type of explosive." A confidential informant told Sergeant Surrett that he had smelled ammonia and heard gun shots coming from the direction of the Cofield property. Stops of two vehicles driven by Jason Cofield within a month of the search resulted in the seizure of items consistent with the manufacture of methamphetamine in the vehicles. (*See* Exhibit A.).

Prior to entry into the Cofield shed on January 24, 2006, Investigator Jordan observed facts which made him believe that he had found the methamphetamine lab wired with explosives and described by the witness. Investigator Jordan testified that while outside the shed, he smelled ammonia, which he said was a common chemical related to the production of methamphetamine. (*Supp. Evid. Hr'g Tr.* at 13). He observed that the shed had motion sensors, closed circuit surveillance cameras, and electrical power–facts consistent with a security system designed to protect

an illicit methamphetamine lab. (*Id.* at 14-15). The presence of electrical cords was consistent with the report that the shed was "wired" with explosives. Investigator Jordan could also see a corroded tank behind the shed, which he testified was consistent with methamphetamine production. (*Id.* at 15-16). These observations were consistent with the shed being used to manufacture methamphetamine. (*Id.* at 17). What Investigator Jordan saw and smelled matched the witness's report that Jason Cofield was manufacturing methamphetamine and had a white shed wired with explosives. As a result, Investigator Jordan had probable cause to believe that he had found an active methamphetamine lab with explosives in it.[2]

Others were also present in the area when Investigator Jordan made these observations. Approximately 40 law enforcement officers were searching the Cofield property. (*Evid. Hr'g. Tr.*

---

[2] Investigator Jordan's observations were made prior to entry into the shed, but after the entry onto Jason Cofield's residence under the belief that the search warrant applied to Jason Cofield's property, and not just Kenneth Cofield's residence (*Supp. Evid. Hr'g. Tr.* at 9). However, there were no structures or fences between Kenneth Cofield's house and Jason Cofield's shed. A driveway also ran up to Jason Cofield's trailer and woods and fields surrounded it. (*Evid. Hr'g. Tr.* at 28, 44, 96; *Supp. Evid. Hr'g. Tr.* at 12). Even if the warrant only authorized law enforcement to be present at Kenneth Cofield's residence, there were no impediments to viewing Jason Cofield's trailer and shed from Kenneth Cofield's residence, or from the open fields and woods of the property.

Additionally, because officers had received a specific tip that Jason Cofield operated a methamphetamine lab and had a white shed wired with explosives on the Cofield property, they had a reasonable fear for their safety at the time of the search of Kenneth Cofield's residence adjoining Jason Cofield's trailer and shed. Therefore, officers were permitted to act on their reasonable fear and conduct a protective sweep of the property surrounding Kenneth Cofield's residence in order to determine if there was a shed matching the informant's information located in the immediate vicinity. Jason Cofield's trailer and shed were located in that surrounding property, so simply walking around Jason Cofield's property and observing the shed from the outside would have been permissible as part of a protective sweep, especially since walking around an unoccupied shed without even looking in the windows only minimally affects the right to privacy. *See United States v. Bernard*, 757 F.2d 1439, 1443 (4th Cir. 1986) (protective sweep around property suspected of marijuana production was permissible because of reasonable fear for safety and minimal intrusion caused by simply looking around the premises).

at 107). Although the shed was in a rural area, the other Cofield homes were in close proximity. For example, Kenneth Cofield's house was only 800 feet away. (*Id.* at 28). The presence of these officers and the other Cofield houses in the immediate area of the shed created a risk to public safety.

Investigator Jordan knew of the dangers posed by methamphetamine labs and explosives. He also had probable cause to believe that he had found a shed with an active methamphetamine lab and explosives in it. Finally, he knew that there were 40 law enforcement officers and another home nearby that would be at risk if the methamphetamine or explosives ignited. Faced with this situation, Investigator Jordan identified an immediate danger of explosion or chemical contamination, consulted with an explosives expert, and made the decision to enter and search the shed in the safest manner possible to protect the lives of those in the area. (*Supp. Evid. Hr'g. Tr.* at 17, 24-25).

The manner in which Investigator Jordan conducted the search of the shed shows the seriousness with which he viewed the risk posed by the shed. He did not just enter the shed, conduct a search, and later claim that exigent circumstances existed. Instead, he consulted with an explosives expert form the Alabama Bureau of Investigation. The initial breach of the shed, on the advice of the expert, was made by shooting a water cannon at the windows first. All of the people in the immediate area were moved into a field at a safe distance while the initial breach was made. And the entry into the shed was made as soon as the equipment was set up to make the breach, only about 30 minutes after Investigator Jordan first smelled ammonia. (*Supp. Evid. Hr'g. Tr.* at 17, 24-25). Then the first law enforcement officer to enter the shed was specially trained in dealing with chemicals in methamphetamine labs and wore special chemical protective gear to protect against the suspected dangerous chemicals. (*Id.* at 18). Only after he first cleared the shed did any other law enforcement officers enter. These actions and the speed with which they were taken show that the

belief that an immediate danger existed was genuine.[3]

It is instructive to compare these facts to those presented in *United States v. Walsh*, 299 F.3d 729. In that case the Eighth Circuit found that exigent circumstances permitted a warrantless search of an outside shed. Officers acting on a tip that a methamphetamine lab was present knocked on the door of a house. The owner consented to a search of the house except for a back bedroom and a storage shed rented by another person. While conducting the consent search of the house, officers noticed a surveillance camera in the house pointing at the shed, an extension cord running to the shed, white residue in a blender pitcher, empty 2-liter bottles, and a strong smell of ether. Based on these observations, the officers conducted a limited search of the shed to determine if a methamphetamine lab was present. Another officer, who had experience in investigating methamphetamine labs, then conducted a second limited search after arriving two hours later. (*Id.* at 731-732.). The Court of Appeals for the Eight Circuit found that exigent circumstances permitted the searches because the police had probable cause to believe that a methamphetamine lab was present. *(Id.* at 734.).

In this case, law enforcement officers noticed similar facts. They smelled chemicals, they saw surveillance cameras and electrical power going to an outside shed, and they saw a corroded, discarded tank. Added to these observations was the previous information regarding the production of methamphetamine on the property that included a warning that a white shed was wired with

---

[3]Compare this case with *United States v. Cooper*, 428 F.Supp 652,654-655 (SDOH 1977): "The argument that the search was necessary to avoid a possible booby-trap is also easily refuted. No sane individual inspects for booby-traps by simply opening the container. Had the FBI seriously believed that the suitcase contained bombs or other explosives, it would have undertaken the search in a much more circumspect manner." In this case, law enforcement acted in a cautious manner consistent with a genuine believe in the presence of explosives and dangerous chemicals.

explosives. Just like in *Walsh*, these facts gave the officers probable cause to believe that the shed behind Jason Cofield's trailer was being used for the production of methamphetamine.

**c. Because exigent circumstances lawfully permitted officers to search Jason Cofield's shed, any evidence found in plain view during the search is admissible.**

Once inside the shed to search for the presence of a methamphetamine lab or a bomb due to exigent circumstances, the officers can then seize any evidence of criminal activity they encounter in plain view during the search. *Glover*, 2007 WL 559805 at *4. However, the scope of the warrantless search must be limited to that necessary to neutralize the emergency. Here, the officers suspected that the shed contained a methamphetamine lab and a bomb. In order to protect the safety of others in the area, they had to confirm whether or not a lab or bomb were in the shed. As a result, they had to conduct a complete and thorough search of the shed. They had to search anywhere a bomb could be located in the shed, which would include containers, cabinets, bags, drawers, etc. Simply breaching an entrance and looking in the shed is not sufficient to find a bomb or dangerous chemicals.[4]

The Supreme Court has recognized that a search conducted pursuant to exigent circumstances may require a "thorough" search. *Warden v. Hayden*, 387 U.S. 294, 299 (1967). How thorough a search may be will depend on the facts that gave rise to the exigent circumstances. The situation encountered by Investigator Jordan and other officers at Jason Cofield's shed is a situation that required a "thorough" search to protect the safety of others. During the course of this search for a

---

[4]The Magistrate Judge's recommendation agrees that suspecting booby traps created exigent circumstances that allowed the officers to breach the windows of the shed with a water cannon. However, the Magistrate Judge goes on to say that these exigent circumstances ended as soon as the windows were broken by the water cannon and no explosion occurred. (*Recommendation of the Magistrate Judge*, at 12).

methamphetamine lab and explosives, officers found firearms and a stolen ATV. The ATV was sitting in the middle of the shed, clearly in view to anyone who walked in. (*Supp. Evid. Hr'g. Tr.* at 22). One firearm, a rifle, was found behind a unlocked cabinet door underneath a workbench (*Id.* at 19.). The other two firearms were pistols found in a suitcase that was sitting on top of an ATV. (*Id.* at 21-22.). One of the pistols was actually in an ammo box located inside the suitcase. (*Id.*). Personal papers seized as evidence were found in a plastic container. (*Id.* at 24). These items were all found in places where an officer would reasonably be expected to look for a bomb or chemicals–under a workbench, in a suitcase, and in a plastic container. Therefore, this evidence was found in plain view during the search due to exigent circumstances and the evidence is admissible.

## **CONCLUSION**

As the Supreme Court has stated, application of the exclusionary rule to suppress evidence in a criminal case should be a "last resort," not the "first impulse." *Hudson v. Michigan*, 126 S.Ct. 2159, 2163 (2006). In this case, the officers who searched Jason Cofield's shed reasonably believed it contained a clandestine methamphetamine lab and may be wired with explosives. Simply stated, to protect themselves and the community, they lawfully breached the shed and discovered incriminating evidence. The actions of law enforcement must be judged by considering "the circumstances then confronting [them]." *Holloway*, 290 F.3d at 1339. As the Tenth Circuit has observed, "We must be careful not to pass judgment fortified with the unharried view provided by hindsight." *Erb*, 596 F.2d at 419-420. There is no reason to second guess these officers and apply the "last resort" to exclude the evidence seized in Jason Cofield's shed. Therefore, the United States respectfully objects to the Magistrate Judge's recommendation to suppress the firearms and ATV discovered in Jason Cofield's shed and requests that the Defendant's Motion to Suppress be

DENIED.

Respectfully submitted this 2nd day of July, 2007

        LEURA G. CANARY
        UNITED STATES ATTORNEY

        /s/ Verne H. Speirs
        VERNE H. SPEIRS
        Assistant United States Attorney
        One Court Square, Suite 201
        Montgomery, AL 36104
        Phone: (334) 223-7280
        Fax: (334) 223-7135
        verne.speirs@usdoj.gov

        /s/ Matthew W. Shepherd
        MATTHEW W. SHEPHERD
        Assistant United States Attorney
        One Court Square, Suite 201
        Montgomery, AL 36104
        Phone: (334) 223-7280
        Fax: (334) 223-7135
        matthew.shepherd@usdoj.gov

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO. 03:06CR208-MEF |
| | ) | |
| JASON EDWARD COFIELD | ) | |

CERTIFICATE OF SERVICE

I hereby certify that on July 2, 2007, I electronically filed the following Jury Instructions with the Clerk of the Court using the CM/ECF system which will send notification of such filing to Pate DeBardeleben.

LEURA G. CANARY
UNITED STATES ATTORNEY

/s/ Verne H. Speirs
VERNE H. SPEIRS
Assistant United States Attorney
One Court Square, Suite 201
Montgomery, AL 36104
Phone: (334) 223-7280
Fax: (334) 223-7135
verne.speirs@usdoj.gov

# Lee County Sheriff's Office
## Application and Affidavit For Search Warrant

☒ State of Alabama         Case Number
☐ Municipality of

     v.

Willis "Kenny" Cofield, alias, Brian Cofield, alias, Jason Cofield, alias, Michael Cofield, alias
    Defendant

**State of Alabama**
in the Circuit
Court of Lee
County Alabama

Before me, _J. d/c Ju..b H. ...lt..._ the undersigned authority, personally appeared Sergeant Donnie Surrett(name of affiant) who being by me first duly sworn, deposes and says:

    During the past six months, the Lee County Sheriff's Office has received information that Jason Cofield, alias, Brian Cofield, alias, and Willis "Kenny" Cofield, alias, were involved in the clandestine manufacture of methamphetamine, as well as the unlawful distribution of methamphetamine. It was determined that the Cofields' address is 5766 Lee Road 270, Valley, Lee County, Alabama.
    On January 01, 2006, at approximately 4:38 P.M. CST, Deputy Dale Richards (with the Lee County Sheriff's Office) performed a traffic stop on a white colored Suburban for a traffic violation. The driver was identified as being Jason Cofield, alias. Consent to search was given and Deputy Richards located two empty compressed gas cylinders inside of the vehicle. Empty gas cylinders are commonly used in the clandestine manufacture of methamphetamine as a storage apparatus for anhydrous ammonia.
    On January 10, 2006, at approximately 11:44 P.M. CST, Deputy Jimmy Sanders (with the Lee County Sheriff's Office) performed a routine traffic stop on a black Pontiac Firebird for a traffic violation. The driver of the vehicle was identified as being Jason Cofield, alias. Consent to search was given and Deputy Sanders located dry ice inside of the vehicle. Dry ice is commonly used in the clandestine manufacture of methamphetamine by generating anhydrous ammonia. Anhydrous ammonia is a precursor chemical used in the manufacturing process.
    On January 19, 2006, Investigator Keith Jordan and members of the United States Attorney's Office conducted an interview on Jimmy Pete McKendree. During this interview, McKendree stated that Jason Cofield was involved in the manufacture of methamphetamine along with Brian Cofield. McKendree continued to say that there was a white utility shed on the property that was wired with some type of an explosive.
    On January 23, 2006, at approximately 10:30 A.M. CST, a reliable confidential informant was on a piece of property that is near to the Cofields' property. While at this location, this informant was overtaken by a strong odor of ammonia coming from the direction of the Cofields' property. Ammonia is a precursor chemical used in the

**EXHIBIT "A"**

clandestine manufacture of methamphetamine. This informant continued to say that they continued to smell ammonia for approximately three and a half hours, which is consistent with the clandestine manufacture of methamphetamine. This informant also stated that they have heard gunshots coming from the residence, as well. This informant has provided information to law enforcement in the past which has led to numerous arrests.

Your Affiant believes that there is sufficient probable cause to believe and does believe that methamphetamine is being manufactured and distributed from 5766 Lee Road 270, Valley, Lee County, Alabama. Your Affiant additionally requests that a "no-knock" search warrant is prudent and necessary for the safety of all the Officers involved.

_____
Signature of Affiant
LCSO/SGT
Agency and Title

Sworn to and Subscribed before
me this the 24th day of January, 2006.

_____
Circuit/District Judge